**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MEGA CONSTRUCTION CORPORATION and | : | |
| HARLEYSVILLE INSURANCE COMPANY OF | : | |
| NEW JERSEY, | : | **CIVIL ACTION** |
|       Plaintiff, | : | |
| | : | **No. 09-01728** |
|    v. | : | |
| | : | |
| QUINCY MUTUAL FIRE INSURANCE COMPANY, | : | |
|       Defendant. | : | |
| | : | |

**Goldberg, J.**                                                    **September 12, 2012**

## MEMORANDUM OPINION

This case involves a defense and indemnification insurance coverage dispute stemming from a construction site accident. Presently before the Court are the cross-motions for summary judgment filed by Plaintiffs, Harleysville Insurance Company of New Jersey ("Harleysville") and Mega Construction Corporation ("Mega"), and Defendant, Quincy Mutual Fire Insurance Company ("Quincy"). For reasons set forth below, we conclude that Quincy was obligated to defend and indemnify its insured. We also conclude that sufficient facts exist that could establish that Quincy acted in bad faith.

## I. Factual and Procedural Background

Mega, a general contractor, was hired to perform work on a retirement community located in Glen Mills, Pennsylvania. Mega subsequently entered into a subcontract with Dobek Contracting, Inc. ("Dobek"), wherein Dobek agreed to, among other things, "[i]nstall all interior trim as per specifications." (Pl.'s Mem. Ex. C.) The contract between Mega and Dobek required Dobek to add

1

Mega as an "additional insured" to its general liability policy as follows:

> The Subcontractor shall name the "Contractor, and/or the Owner and/or any other interested parties as designated by the Owner", as Additional Insureds on a primary basis on all Liability Policies of the Subcontractor, throughout the duration of the Project . . . .

(Pl.'s Mem. Ex. C, § 8.9.6.)

As required, Dobek added Mega to its general liability policy, which was procured through Quincy. The result was an endorsement that provided:

> **Who Is An Insured (Section II)** Is amended to include as an insured the person or organization shown in the Schedule, but only <u>with respect to liability arising out of your ongoing operations performed for that insured</u>.

(Pl.'s Mem. Ex. D. (emphasis added).)

On the morning of August 10, 2006, Victor Tavares, an employee of Dobek, was installing door frames in one of the buildings at the Glen Mills project. (Pl.'s Mem. Ex. B, ¶¶ 10, 12.) The work on the frames was nearly completed, and a truckload of doors was expected to arrive. (Tavares Dep., Pl.'s Mem. Ex. L, pp. 69-72.) Tavares's supervisor told him that a truck was nearby, and asked Tavares to look for it so that they could unload the truck and begin installing the doors. (<u>Id.</u>, pp. 76-77.)

Tavares went out the front door on the first floor of the building to locate the truck. When he could not see the truck from that location, he "went upstairs" in order to "see better." (<u>Id.</u>, p. 77.) Looking out the window, Tavares could still not see the truck, and thus leaned out, putting his weight on a fall protection bar. (<u>Id.</u>, p. 90.) The bar gave way, causing Tavares to fall, and resulting in traumatic and severe "orthopedic, neurological, psychological, and psychiatric injuries," which rendered him permanently disabled. (Pl.'s Mem. Ex. B, ¶ 22.)

2

Approximately two years later, on April 4, 2008, Tavares filed a complaint against Mega and several other entities, alleging that their negligence caused his injuries.   (Pl.'s Mem. Ex. A, ¶ 1.) Specifically, Tavares alleged that Mega breached its duty to provide a reasonably safe work environment by failing to, among other things, install and maintain adequate fall protection.  (Pl.'s Mem. Ex. B, ¶ 27.)  In April 2007, prior to the filing of that suit, Harleysville, as the general liability insurer for Mega, sent correspondence to Quincy advising of Tavares's injury, citing the additional insured clause in the subcontract, and requesting a copy of the "general liability insurance policy in effect on the date of loss."  (Quincy Opp. Mem. Ex. 3.)  The assigned claims adjuster for Quincy responded on April 25, 2007, writing, "Quincy . . . is in receipt of your request that we provide the defense and indemnification for your insured."  (Id.)  Quincy's correspondence further informed Harleysville that Quincy had begun investigating the claim, and stated that "Quincy Mutual will advise you of our position as soon as possible."  (Id.)

When it received no response from Quincy, Harleysville sent follow-up correspondence on June 28, 2007, requesting an update from Quincy on the status of its investigation, and again requesting a copy of the Quincy policy.  (Quincy Opp. Mem. Ex. 3.)  Quincy again failed to respond. (Bissanti Dep., Pl.'s Mem. Ex. T, pp. 66-67.)  Quincy's claims adjuster later explained that he "might have had a lot of mail come in at the same time, [or] other claims that needed working on." (Id., p. 67.)  Importantly, Quincy's claims adjuster acknowledged that he "just didn't get to it."  (Id.)

Approximately one year later, Harleysville again contacted Quincy after Tavares had filed his lawsuit.  (Pl.'s Mem. Ex. I.)  In this correspondence, Harleysville formally tendered the defense of Mega to Quincy, and demanded indemnification for Mega as an additional insured.  (Id.)  Quincy did not respond to this correspondence, and the claims adjuster again acknowledged that he "just

didn't get to it." (Bissanti Dep., p. 95.)   When asked why he did not respond to either of Harleysville's inquiries, and why Quincy did not make a coverage decision, the adjuster explained:

> At this point, I still felt that really nothing had changed; I could not make a decision on the contractual indemnification, and I could not make a decision, come to a conclusion on the additional insured aspect of it.  I should have responded to let them know that . . . additional information was needed, but I did not do that.

(Id., p. 96.)

Ultimately, Mega instituted this declaratory judgment action.  On July 15, 2009, over two years after being contacted by Harleysville, and more than a year after Tavares instituted the underlying action, Quincy denied coverage, contending that "it remains questionable whether Mr. Tavares's accident arose out of the ongoing operations of the named insured, Dobek." (Pl.'s Mem. Ex. M.)  After receiving a response from Harleysville urging Quincy to reconsider, Quincy wrote a clarification letter, in which it articulated the primary position it has taken in this case: coverage for Mega as an additional insured only exists "when the allegations *involve the negligence* of the named insured's (Dobek) operations." (Pl.'s Mem. Ex. F.)

Meanwhile, on September 21, 2010, the underlying litigation concerning Tavares's injuries was settled for a total of $7,887,500.  Mega's portion of the settlement was $1.1 million, and Mega was defended and indemnified by Harleysville. (Pl.'s Mem. Ex. J.)  Quincy also participated in the underlying action, including settlement negotiations, but on behalf of Dobek only. (Id.)  When asked to explain why Harleysville agreed to that settlement amount, Louis Kozloff, a Harleysville representative, testified:

> Harleysville believed . . . $1.1 million was a reasonable settlement given all factors considered in evaluating its insured's exposure in the case, everything from the nature and extent of Mr. Tavares'[s] injuries which were significant and catastrophic, the demands and evidence that Mr. Tavares'[s] attorneys had been

4

making, and the evidence and experts that they had lined up to support their claim.
       The demands were I think as high as $25 million.  And as mediation began
in June of 2009, the demand was $18 million something, maybe $19 million.  Mr.
Tavares was represented by very competent and capable counsel who have a
reputation of being among the strongest plaintiffs personal injury attorneys in the
Philadelphia area . . . .
       The case was venued in the Court of Common Pleas for Philadelphia County,
which is a challenging venue for defendants.
       In Pennsylvania, there is—in terms of joint liability, any defendant that is
found at one percent fault in the accident can be on the hook—or responsible I should
say—to the plaintiff [for] the full amount of any verdict or judgment entered.

(Kozloff Dep., Pl.'s Mem. Ex. P, pp. 77-78.)  This testimony was mirrored by one of Harleysville's

litigation associates, who stated: "We have a very competent plaintiff[s'] attorney who's known to

have obtained very high verdict[s] on similar cases.  I think something like $75 million.  And the

facts of the case; the catastrophic injury involved.  And it's Philadelphia, so a runaway verdict is not

out of reality."  (Khan Dep., Pl.'s Mem. Ex. Q, p. 38.)

       Having funded Mega's defense and settlement in the underlying action, on January 6, 2011,

Harleysville moved to join this declaratory judgment action as a real party in interest.  (Doc. No.

47.)  The Court granted Harleysville's motion, permitting it to seek a declaration that Quincy had

a duty to defend and indemnify Mega for the Tavares litigation. (Doc. No. 54.)  The Court permitted

Mega to remain as a Plaintiff in this action in order to pursue its claim that Quincy's handling of its

insurance claim, and its coverage positions, amounted to bad faith.  (Id.)  The parties subsequently

filed cross-motions for summary judgment on both Harleysville's duty to defend and indemnify

claims, and Mega's bad faith claim.

## II. Summary Judgment Standard

       Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Where cross-motions for summary judgment have been filed, as is the case here, the following standards apply:

> In cases where the parties filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective. We must, therefore, consider each motion for summary judgment separately. The standards under which we grant or deny summary judgment do not change because cross-motions are filed. Each party still bears the initial burden of establishing a lack of genuine issues of material fact. Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted.

Williams v. Phila. Housing Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd 27 F.2d 560 (3d Cir. 1994) (citations omitted).

## III. Discussion

### A. Choice of Law

There is some question as to whether Pennsylvania or New Jersey law should apply. Quincy cites interchangeably to both, suggesting that there is no conflict. (See, generally, Quincy Opp.

Mem.)  Plaintiffs assert that the laws of Pennsylvania and New Jersey are in accord, but that to the extent a conflict exists, New Jersey law should govern.  (Pl.'s Mem., n. 5.)  As explained below, the Court finds that Pennsylvania and New Jersey law are in agreement with regard to most issues in the case, but that the laws differ with respect to Harleysville's ability to recover attorneys' fees related to the declaratory judgment action, and the legal standard applicable to Mega's bad faith claim.

As a federal court sitting in diversity, we apply the choice-of-law rules of Pennsylvania, the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).  In Hammersmith v. TIG Ins. Co., 480 F.3d 220 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit clarified the approach that courts applying Pennsylvania choice-of-law rules should take regarding contract cases.  First, the court must decide whether there is an "actual" conflict between the competing laws; that is, whether application of each states' law would produce different results.  Id. at 230.  If there are relevant differences, then the court must decide whether the conflict is a "true" conflict, a "false" conflict, or an "unprovided-for" conflict.  Id.  A conflict is "true" if both states' "interests would be impaired by the application of the other's laws."  Id.  A "false" conflict exists only if one state's interests would be impaired by the application of the other's law, at which point the court must apply the law of the state whose interests are at stake.  Id. at 229.[1]  It is only if a true conflict exists that a court must undertake the full contacts and interests analysis to determine which states' law applies.  Id. at 230.

Here, we find that no conflict exists between Pennsylvania and New Jersey law regarding

---

[1] "An 'unprovided-for' case is one in which neither state's interests would be impaired if its laws were not applied.  In that situation, courts should apply the traditional, lex locus contractus rule."  Hammersmith, 480 F.3d at 230 n.9 (citations omitted).  Under the lex locus contractus rule, the court applies the law of the state in which the contract was made.  Id. at 227.

several issues.  As explained in greater detail below, Pennsylvania interprets the "arising out of" language that is at the heart of this case to mean "but-for causation," rather than proximate cause. Rust Eng'g & Constr., Inc. v. J.C. Zampell Constr., Inc., 1997 WL 773153, at *3 (E.D. Pa. Dec. 11, 1997).  Similarly, New Jersey courts interpret this language to mean "causally connected with, not proximately caused by."  Krastanov v. K. Hovanian/Shore Acquisitions, LLC, 2008 WL 2986475, at *8 (N.J. Super. Aug. 6, 2008).  While the causal connection has been variously stated in New Jersey cases as "originating from," Westchester Fire Ins. Co. v. Continental Ins. Cos., 312 A.2d 664, 669 (N.J. Super. Ct. App. Div. 1973), "growing out of," id., or "having a substantial nexus with," Cnty. of Hudson v. Selective Ins. Co., 752 A.2d 849, 852 (N.J. Super. Ct. App. Div. 2000), there seems to be little practical difference between these tests and the "but-for" test employed in Pennsylvania.

We also find there to be no conflict between Pennsylvania and New Jersey law as to (1) whether Quincy must reimburse Harleysville for its costs in defending the Tavares action; (2) whether Quincy must reimburse Harleysville for the settlement of the Tavares action; and (3) the priority of the policies.  The Court will thus cite to both Pennsylvania and New Jersey cases throughout the sections of the opinion dealing with these issues.  See Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006) ("If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply.").

We do however find there to be two issues where an actual conflict of law exists.  These issues are: (1) whether Quincy must reimburse Harleysville for the cost of bringing this declaratory judgment action; and (2) Mega's bad faith allegations.  Pennsylvania allows an insured to be reimbursed for the cost of bringing a declaratory judgment action if the insurer acted in bad faith,

Kiewit Eastern Co., Inc. v. L & R Constr. Co., Inc., 44 F.3d 1194, 1205 (3d Cir. 1995), while New Jersey, by rule, allows reimbursement in favor of a "successful claimant," Foodtown, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 412 Fed Appx. 502, 509 (3d Cir. 2011); N.J.R. Ct. 4:42-9(a)(6). Although bad faith is a factor for the trial court to consider under the New Jersey rule, "a plaintiff need not show that an insurer acted in 'bad faith' to recover." Burlington Ins. Co. v. Northland Ins. Co., 766 F. Supp. 2d 515, 532 (D.N.J. 2011). Further, "because the standards for whether an insurance company acted in bad faith, and the remedies available to an insured, differ" between Pennsylvania and New Jersey, there is an actual conflict on that issue as well. Paul Revere Life Ins. Co. v. Patniak, 2004 WL 1059805, at *3 (D.N.J. Apr. 1, 2004). As to both of these issues, we must thus decide whether the conflict is "true," in the sense that the interests of both states would be sacrificed by applying the other's law. Hammersmith, 480 F.3d at 232.

Both the rule governing costs to be awarded in a declaratory judgment action brought by an insured against an insurer and the rule governing bad faith ultimately concern the conduct of the insurer toward its insured. The Third Circuit has concluded that "the protection of insured parties is the primary public policy behind laws governing duties owed by an insurer to an insured." Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379 (3d Cir. 1992). "Specifically, the policy behind Pennsylvania's bad faith statute 'is that the Pennsylvania legislature was concerned about protecting its own residents/insured from overreaching insurance companies.'" Patniak, 2004 WL at *3 (quoting Kilmer v. Conn. Indem. Co., 189 F. Supp. 2d 237, 246-47 (M.D. Pa. 2002)). Similarly, New Jersey recognizes a cause of action for bad faith in order to adequately protect the rights of its insureds. Pickett v. Lloyd's, 621 A.2d 445, 451-52 (N.J. 1993).

Here, the insured, Mega, is a New Jersey corporation that has its principal place of business

9

in New Jersey.  (Pl.'s Mem., p. 8 n.5)  Quincy, the insurer whose conduct is to be regulated, is located in Massachusetts.  This gives New Jersey a significant interest in applying its own law to protect its insureds, and means that Pennsylvania's interest would not be harmed in any event.  Put another way, applying Pennsylvania law would not further the interest of protecting Pennsylvania insureds, because there are no such insureds involved in this case.  Therefore, because only New Jersey has an interest in having its law applied, New Jersey law governs reimbursement of costs for the filing of the declaratory judgment action, as well as Mega's bad faith claim.  See Gen. Star., 960 F.2d at 379 ("Because the protection of insured parties is the primary public policy behind laws governing duties owed by an insurer to an insured, Pennsylvania has little interest in furthering the primary public policy implicated here: protection of a New York insured and a Connecticut excess insurer by means of regulating the conduct of a Massachusetts primary insurer.").

**B. Mega's Entitlement to Coverage Under the Quincy Policy**

Two issues relate to Harleysville's ability to recover on behalf of Mega under the Quincy policy.  The first is whether the liability at issue here—that is, Mega's liability for the injuries of Tavares—is covered under the Quincy policy.  This requires examining whether the liability "arose out of" Dobek's ongoing operations.  Second, assuming the above question is answered in the affirmative, we must decide whether the Quincy policy provides primary or excess coverage.

**1. Quincy's Duty to Defend and Indemnify Mega.**

As previously noted, the Quincy policy was amended "to include as an insured [Mega], but only with respect to liability arising out of your [Dobek's] ongoing operations for that insured." (Pl.'s Mot. Ex. D, at 814 (emphasis added).)  Plaintiffs argue that because Mega's liability for Tavares's injuries arose out of Dobek's ongoing operation, the Quincy policy applies.  Quincy disagrees and

counters that the endorsement provides Mega with coverage only for vicarious liability arising from Dobek's operations, and not for liability due to Mega's own negligence.  In the alternative, Quincy contends that even if the policy does insure Mega for its own negligence, the connection between Tavares's fall and Dobek's "ongoing operations" is too tenuous to conclude that Mega's liability arose from Dobek's operations.

Quincy's first argument—that Mega's negligence is not covered—is inconsistent with the plain language of the policy, and with the laws of Pennsylvania and New Jersey.  Both states recognize that additional insured endorsements with language similar to this one may cover liability arising out of the additional insured's own negligence.  See Markel Int'l Ins. Co., Ltd. v. Centex Homes, LLC., 2006 WL 278920 at *4 (D.N.J. Feb. 2, 2006) (predicting that the law of New Jersey would conform to the majority of jurisdictions and holding that an "additional insured may be covered for its independent acts of negligence")[2]; Twp. of Springfield v. Ersek, 660 A.2d 672, 676 (Pa. Cmwlth. 1995) (holding that the additional insured endorsement provided coverage for the Township "regardless of whether the negligence which gives rise to the claim rests with Ersek or with the Township").[3]  This is not to say that every additional insured endorsement will be read to provide coverage for the independent negligence of the additional insured.  Rather, we conclude that the

---

[2] The endorsement read:
"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you."  Markel, 2006 WL at *1 n.2.

[3] The endorsement read:
"The 'persons insured' provision is amended to include as an insured the person or organization named below but only with respect to liability arising out of the operations performed by the named insured."  Ersek, 660 A.2d at 673 n.2.

provision in this case is broad enough to provide coverage for Mega's negligence.[4]

Turning to the application of the policy endorsement to the facts of this case, courts applying Pennsylvania and New Jersey law interpret the "arising out of" language at issue here broadly to require either "but-for" causation or a "substantial nexus." Rust Eng'g, 1997 WL 773153, at *3 (E.D. Pa. Dec. 11, 1997); Cnty. of Hudson, 752 A.2d at 852. The analysis is fact-specific because it requires the court to ascertain what the "ongoing operations" are, and then examine the relationship between those operations and the insured's liability. Cnty. of Hudson, 752 A.2d at 852. In deciding whether there is a sufficient connection between Dobek's ongoing operations and Mega's liability, it is helpful to examine the case law in some detail. Because Pennsylvania and New Jersey law are identical on this issue, both are considered in our analysis.

In Township of Springfield v. Ersek, 660 A.2d 672 (Pa. Cmwlth. 1995), the Township leased a golf pro shop to Ersek, and as a condition of the lease Ersek was required to name the Township as an additional insured on his general liability policy.[5] Id. at 673. While working, one of Ersek's

---

[4] Harbor Insurance Co. v. Lewis, 562 F. Supp. 800 (E.D. Pa. 1983), provides an example of a narrowly-drawn additional insured endorsement. In Harbor, the City of Philadelphia was named an additional insured on the Reading Railroad Company's liability policy. Id. at 802. After a child was run over by the train, the City and Reading were found jointly and severally liable, and the City sought coverage as an additional insured. Id. The additional insured provision read: "It is agreed that the insurance afforded by this policy shall apply to the following additional insureds but only to the extent of liability resulting from occurrences *arising out of the negligence of* Reading Company and/or its wholly owned subsidiaries." Id. (emphasis added). The court held that the policy covered only the City's vicarious liability for Reading's negligence, and therefore provided no coverage. Id. at 806. Quincy cites Harbor Insurance for the proposition that additional insured endorsements are meant only to protect additional insureds from vicarious liability, but fails to distinguish the materially different language in its endorsement as compared to Harbor Insurance. (Quincy Opp. Mem., p. 15.)

[5] The language of the endorsement is quoted supra, at note 3. The other cases cited in this section involved endorsements with materially similar language.

employees slipped and fell on the steps leading from the pro shop to the parking lot.  Id.  When the employee sued the Township for negligence, the Township claimed coverage as an additional insured under Ersek's policy.  Id.  The court held that there was coverage.  It defined the shop's "operations" broadly, as "Golf Pro Shop operations conducted by the insured," and found that the employee fell on the pro shop premises while acting in the scope of his employment with Ersek.  Id. at 676.  Thus, there was a sufficient causal connection between the pro shop's operations and the employee's injuries.  Id. at 677.

A similar result was reached in Rust Engineering & Construction Inc. v. J.C. Zampell Contruction, Inc., 1997 WL 773153 (E.D. Pa. Dec. 11, 1997).  In that case, the owner of a facility hired an engineer and general contractor to construct a trash-to-steam plant.  Id. at *2.  The general contractor then hired a subcontractor (Zampell) to perform part of the work, and required the subcontractor to add the owner, engineer, and general contractor as additional insureds on its liability policy.  Id. at *3.  Zampell hired another subcontractor (Snyder) to perform part of the work, and one of Snyder's employees was injured when he slipped on snow and ice in the parking lot of the job site.  Id. at *1.  The employee sued Zampell and the additional insureds, and the additional insureds sought coverage from Zampell's insurer.  Id.  The court concluded that Zampell's "operations" included furnishing "all supervision, administration, labor, tools, construction equipment, and all necessary supplies and incidentals."  Id. at *3.  Further, the court found that hiring Snyder as a subcontractor was part of Zampell's operations because it was intended to help Zampell complete the job under its own subcontract.  Id. at *4.  Therefore, the court concluded that but for Zampell hiring Snyder, Snyder's employee would not have been injured, and thus, under Pennsylvania's but-for test, the court found coverage.  Id.

13

The breadth of the term "arising out of" is further demonstrated by the court's decision in Krastanov v. K. Hovanian /Shore Acquisitions, LLC, 2008 WL 2986475 (N.J. Super. App. Div. Aug. 6, 2008). There, a contractor (Hovanian) hired a subcontractor for plumbing work, and required the subcontractor to add Hovanian as an additional insured on its policy. Id. at *1. After his crew ended work for the day, an employee of the subcontractor decided to "cool off" by swimming in a man-made pond on the job site. Id. The employee tragically drowned in the lake, and a lawsuit was filed against Hovanian, which claimed coverage under the subcontractor's policy. Id. Observing the "broad and liberal" interpretation applied to the "arising out of" language, id. at *8, the court concluded that there was a substantial nexus between the drowning and the contractor's work. While the court found that the mere fact that the subcontractor's "work placed [the employee] on the property" did not provide the necessary nexus, the fact that the subcontractor had contractually assumed the obligation to provide for the "supervision and safety" of its workers did. Id. at *9.

The circumstances addressed in R.R. Donnelley & Sons, Co. v. Fireman's Fund Ins. Co., 2004 WL 2810065 (E.D. Pa. Dec. 6, 2004), perhaps most closely resemble those presented here. In R.R. Donnelley, an employee of a trucking company was injured while picking up a bale of paper at R.R. Donnelley's plant. Id. at *1. The trucker was clearing space in his truck when the bale rolled off a forklift operated by an R.R. Donnelley employee, crushing him. Id. The trucker sued, and R.R. Donnelley sought coverage as an additional insured under the trucking company's policy. Id. Relying on the Ersek case, the court found that the trucker's injury, which occurred while he was cleaning out his truck to make room for a load of paper, arose out of the trucking company's operations. Id. at *4.

Here, Tavares was on the job, and performing a task necessary to that job, when his injury occurred. Much like the trucker in R.R. Donnelley who had to clear space before he could transport

14

the bale of paper, Tavares was tasked with locating the delivery truck that contained supplies necessary for Dobek to continue its work.

Quincy urges that the facts of this case resemble those at issue in Time Warner Entertainment Co., L.P. v. Travelers Cas. & Sur. Co., 1998 WL 800319 (E.D. Pa. Nov. 10, 1998). In that case, Time Warner contracted with a subcontractor (Friendshuh) to build a cable television system. Id. at *1. Under the contract, Friendshuh had Time Warner added to its liability policy as an additional insured. Id. When one of Friendshuh's employees began working without a hard hat, his supervisor sent him off the job site to retrieve one. Id. Rather than returning home, the employee stopped at a cable warehouse (coincidentally owned by Time Warner) where he knew some of the workers, and paid them to let him take one of their hats. Id. The employee was injured obtaining the hat, and subsequently sued Time Warner, which claimed coverage under Friendshuh's liability policy. Id. The court found no coverage, reasoning that the employee was not performing work for Friendshuh when he was injured, as he was not directed to go to the particular warehouse, and was not being paid for the time he was gone, all factors weighing against a finding that Friendshuh's "work" was the but-for cause of the employees injury. Id. at *9.

After careful consideration of the precedent discussed above, and an examination of the scope of Dobek's ongoing operations, which included at least the installation of interior trim in the building from which Mr. Tavares fell,[6] we conclude that Tavares's injury plainly arose out of Dobek's

---

[6]Mega argues that Dobek's obligations were broader in that Dobek agreed in the subcontract "to furnish, provide and install all labor, *supervision*, materials, equipment, plant, supplies, tools, scaffolding, hoisting, transportation, unloading and handling, work and other services, and everything else required to perform and complete the Work required by the General Contract." (Mega Mem. Ex. C, Art. 1.) This would make Dobek's obligations more like those of the subcontractor in Krastanov, whose responsibility for safety provided the substantial nexus required for coverage. Krastanov, 2008 WL at *9. Given the fact that the employee in that case was clearly

"ongoing operations."  The undisputed facts support this conclusion and establish that on the day of the accident, Tavares was: (1) working for Dobek on the job site; (2)  performing the work that he was hired to do (installing door frames); (3) attempting to locate a delivery truck, which was supposed to deliver doors; and (4) undertaking this task pursuant to instructions received from his employer. (Tavares Dep., pp. 66-79; Pl. SOF ¶¶ 4-6.)[7]

These facts establish a closer connection between Tavares's injury and Dobek's ongoing operations than those in <u>Krastanov</u>, and similar to those in <u>Ersek</u>, <u>Rust Engineering</u> and <u>R.R. Donnelley</u>.  At the time of Tavares's injury, Dobek had nearly finished installing the door frames and planned to begin installing doors in those frames after they were delivered.  Tavares was injured while looking for the truck that was delivering those doors, as he had been instructed to do by his direct supervisor.  (Tavares Dep., pp.67-79.)  In short, Tavares's injury occurred while performing a task necessary for Dobek to continue its operations at the job site.

Contrary to Quincy's assertion, the facts of this case in no way resemble those addressed in <u>Time Warner</u>, where the employee was injured while away from the job site, was not being paid at the time, and was not performing work when the injury occurred.  <u>Time Warner</u>, 1998 WL at *9. Here, Mr. Tavares was injured at the job site, while performing work for Dobek, and while being paid.  Indeed, Dobek could not complete its operations until the truckload of doors that Tavares was

---

not performing his work at the time of the injury, reliance on the broader safety obligation was necessary.  As explained above, because Mr. Tavares was injured while performing Dobek's ongoing operations—he was on the job installing trim—it is unnecessary for us to rely on a broader definition of Dobek's "ongoing operations."

[7] Quincy does point out that it is not clear from the testimony whether Mr. Tavares was instructed to look for the truck from the window of an upper floor.  (Quincy Opp. Mem., p. 10.)  This fact is immaterial.  Even if the Mr. Tavares went upstairs to look for the truck purely on his own initiative, it is still clear that he was performing a part of Dobek's "ongoing operations."

trying to locate arrived and was unloaded.

We therefore conclude that Mega's liability for Mr. Tavares's injuries arose out of Dobek's ongoing operations, and hold as a matter of law that Quincy breached its duties to defend and indemnify Mega in the underlying case.

### a. Damages for Breach of the Duty to Defend.

As a consequence of Quincy's breach of its duty to defend Mega, Harleysville argues that it is entitled to two sets of costs: (1) the cost to defend the underlying personal injury action brought by Mr. Tavares, and (2) the cost of prosecuting this declaratory judgment action against Quincy.

When an insurer breaches its duty to defend an insured, it must reimburse the insured for the defense costs.  Kiewit Eastern Co., Inc. v. L & R Constr. Co., Inc., 44 F.3d 1194, 1206 (3d Cir. 2004); Ionbond, Inc. v. Valley Forge Ins. Co., 2010 WL 5185472, at *3 (N.J. Super. App. Div. Dec. 6, 2010). Having determined that Quincy breached its duty to defend, we hold that Quincy is obligated to reimburse Harleysville for the costs of defending Mega in the Tavares action.

As previously discussed, New Jersey law applies to the issue of whether Harleysville can recover the costs of this declaratory judgment action.  See § III, A, supra.  By rule, New Jersey allows for an award of attorneys fees and costs "[i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant."  N.J. Ct. R. 4:42-9(a)(6); Foodtown Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 412 Fed. Appx. 502, 509 (3d Cir. 2011).  A showing of bad faith is not required for an award of fees.  Burlington Ins. Co. v. Northland Ins. Co., 766 F. Supp. 2d 515, 532 (D.N.J. 2011).  The purpose of the rule is "to discourage groundless disclaimers and to provide more equitably to an insured the benefits of the insurance contract without the necessity of obtaining a judicial determination that the insured, in fact, is entitled to such protection."  Sears Mrtg. Corp. v.

17

Rose, 634 A.2d 74, 88 (N.J. 1993).

Even if a claim for attorney's fees fulfills the letter of the statute, the "trial judge has broad discretion as to when, where and under what circumstances counsel fees may be proper." Enright v. Lubow, 521 A.2d 1300, 1304 (N.J. Super. Ct. App. Div. 1987). In deciding whether to award fees, the court may consider several factors, including: (1) the insurer's good faith, or lack thereof; (2) excessiveness of the plaintiff's demands; (3) bona fides of one or both of the parties; (4) the insurer's justification in litigating the issue; (5) the insured's conduct in contributing to the necessity of litigation; (6) the general conduct of the parties; and (7) the totality of the circumstances. Id.; Burlington Ins. Co., 766 F. Supp. 2d at 532. There is substantial overlap among the factors, and the list is not an exhaustive one. New Jersey courts have noted that there is a presumption that a successful insured is entitled to attorney's fees. IFA Ins. Co. v. Millburn Surgical Cntr., 2011 WL 1376677, at *2 (N.J. Super. App. Div. April 13, 2011).

As a threshold matter, Harleysville is clearly a "successful claimant," whose claim falls squarely within the statute. N.J. Ct. R. 4:42-9(a)(6). We further conclude that there is no genuine issue of material fact that Quincy, even if not acting in bad faith, did not adequately and fairly respond to Mega's claim. The undisputed facts reflect that Harleysville first contacted Quincy on April 23, 2007. Quincy responded on April 25, 2007, advising it had begun investigating the coverage claim, and requesting a copy of Mega's insurance policy and the subcontract between Mega and Dobek. (Quincy Opp. Mem. Ex. 3.) Harleysville responded on June 28, 2007, with a request for an update on the status of the investigation and a copy of the general liability policy "in effect on the date of the loss." (Quincy Opp. Mem. Ex. 3.) The record contains no evidence that Quincy ever responded to this request. On July 7, 2008, a litigation specialist for Harleysville followed up and formally

18

tendered the defense of Mega in Mr. Tavares's lawsuit.  (Quincy Opp. Mem. Ex. 2.)  The Quincy adjuster did not respond, even though he acknowledged during his deposition that he "should have responded to let [Harleysville] know additional information was needed" to make a coverage determination.  (Bissanti Dep., p. 96.)  When asked why he did not respond, he stated, "I just wasn't able to get to it."  (Id., p. 97.)

We also conclude that an award of fees and costs would serve the purposes of Rule 4:42-9(a)(6).  Quincy's delay in addressing the claim, and its failure to respond contributed significantly to the "necessity of the litigation."  Enright, 521 A.2d at 1304.  Even putting aside that Quincy's eventual coverage position was not a strong one, Quincy failed to clearly articulate and convey its coverage position to Harleysville until two years after the companies first exchanged letters. (Quincy Opp. Mem. Ex. 8.)  Had Quincy engaged with Harleysville sooner, a lawsuit might have been avoided altogether.

For the reasons stated above, Harleysville is entitled to the costs and fees associated with this declaratory judgment action.

### b. Damages for Breach of the Duty to Indemnify.

Harleysville has paid $1.1 million in settlement of Mr. Tavares's claims against Mega. Because Quincy breached its duty to indemnify, the laws of both Pennsylvania and New Jersey require Quincy to reimburse Harleysville (up to its policy limit) if the settlement is reasonable and was negotiated in good faith.  Griggs v. Bertram, 443 A.2d 163, 172 (N.J. 1982); Alfiero v. Berks Mut. Leasing Co., 500 A.2d 169, 172 (Pa. Super. Ct. 1985).  In determining whether a settlement was reasonable, the court must consider both "the size of possible recovery and [the] degree of probability of [the] claimant's success against the insured."  TIG Ins. Co. v. Nobel Learning Communities, Inc.,

2002 WL 1340332, at * 12 (E.D. Pa. Jun. 18, 2002) (quoting American Intern. Underwriters Corp. v. Zurn Indus., Inc., 771 F.Supp. 690, 702 (W.D. Pa. 1991)).  Both Pennsylvania and New Jersey put the ultimate burden of persuasion on the insurer to show that the settlement was unreasonable, although New Jersey requires the insured to initially produce some evidence showing reasonableness and good faith.   Griggs, 443 A.2d at 367-68.   Here, we conclude that summary judgment is appropriate on the indemnification issue even under the more stringent standard applicable in New Jersey.

Harleysville has clearly met its initial burden to produce evidence showing that the settlement was reasonable.  The case for liability against Mega in the underlying action appears to have been strong.  As a general contractor, Mega had a duty to ensure that the premises on which its subcontractor, Dobek, performed its work was in a reasonably safe condition.  O'Keefe v. Sprout-Bauer, inc., 970 F.2d 1244, 1251 (3d Cir. 1992).  The undisputed evidence indicated that Tavares's fall was caused by a guard rail that gave way, and at least one expert had concluded that Mega had failed to properly oversee the installation and maintenance of that guard rail.  (Tavares Dep., p. 90; Pl.'s Mem. Ex. R.)

Harleysville has also produced compelling evidence showing that the amount of the settlement was reasonable in light of Tavares's possible recovery.  When asked why it agreed to the settlement, a representative of Harleysville cited several reasons: (1) Tavares had suffered "catastrophic" injuries in the fall; (2) demands were as high as $25 million, and remained substantial throughout the litigation; (3) Tavares was represented by one of "the strongest plaintiffs personal injury attorneys in the Philadelphia area;" (4) the case was set to be tried in Philadelphia, which Harleysville viewed as a plaintiff-friendly venue; and (5) under Pennsylvania's joint liability rules, "any defendant that is

found at one percent fault in the accident" can be responsible for the entire judgment.[8] (Kozloff Dep., pp. 77-78.)  This testimony was undisputed and corroborated by one of Harleysville's litigation associates.  (Khan Dep., p. 38.)

Quincy, on the other hand, has failed to identify any testimony, documents, or other evidence suggesting that the $1.1 million Harleysville paid to settle Tavares's claim was unreasonable, or that Harleysville negotiated the settlement in bad faith.[9]  Since the ultimate burden of showing the settlement to be unreasonable rests with the insurer, Quincy's failure to produce any evidence from which a reasonable fact finder could find in its favor renders summary judgment appropriate.  Based upon the evidence in the record, a reasonable fact finder would be compelled to find that Harleysville's settlement of Tavares's claims was reasonable and in good faith.  Quincy must therefore indemnify Harleysville for the settlement, up to the policy limits.

### 2. The Priority of the Respective Policies.

Both the Harleysville and Quincy policies include an "Other Insurance" clause which addresses the issue of priority where another policy also provides coverage.  The substance of the relevant portions of each policy is very similar, and provides that "[t]his Insurance is primary" when

---

[8] Although this was an accurate statement of the law at the time of the deposition, it is no longer.  Pennsylvania has since made the liability of defendants several only, except in certain circumstances.  42 Pa. Cons. Stat. § 7102 (2011).

[9] Indeed, Quincy's position is premised entirely upon New Jersey's Joint Tortfeasors Contribution Act, which states that the right of contribution between joint tortfeasors does not attach where the action is settlement, but requires entry of a judgment.  See N.J.S.A. 2A:53A-3.  This argument is completely misplaced because Harleysville is not seeking contribution, but is enforcing Mega's contractual right to indemnification under the Quincy policy.

no exceptions apply.  (Pl.'s Mem. Ex. D.)  The Quincy policy states as an exception that its "[i]nsurance is excess over":

> (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional Insured by attachment or endorsement.

(Pl.'s Mem. Ex. D.)  Similarly, the Harleysville policy provides that its "insurance is excess over":

> (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment or endorsement."

(Pl.'s Mem. Ex. S.)  Mega is named as an additional insured by endorsement on the Quincy policy, and is a named insured on the Harleysville policy.

The law of Pennsylvania and New Jersey reach the same conclusion regarding the priority of the Quincy and Harleysville policies.  Where the language of two competing policies are reconcilable, the language must be enforced.  R.R. Donnelley, 2004 WL at *5.  On the other hand, where fidelity to the language of both policies is impossible—that is, where one cannot be enforced without running afoul of the other—they are deemed "mutually repugnant," and the insurers must share responsibility for the claim.  Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co., 147 A.2d 529, 533-34 (N.J. 1959); Progressive Northern Ins. Co. v. Universal Underwriters Ins. Co., 898 A.2d 1116, 1120 (Pa. Super. Ct. 2006).

In R.R. Donnelley, the court examined "Other Insurance" clauses very similar to the ones at issue here, and found the two policies to be reconcilable.  2004 WL 2810065, at * 5 (E.D. Pa. Dec. 6, 2004).  The court reasoned that each "Other Insurance" provision was meant to subordinate the policy to any insurance on which the insured had been named an "additional insured."  Because the

insured had only been named an additional insured on one policy, that policy was deemed primary and the clauses were found to be reconcilable.   Id.

        We find this reasoning persuasive.  Mega was named an additional insured only on the Quincy policy.  Mega is the named, and not the additional, insured on the Harleysville policy.  Because the Harleysville policy declares that its insurance is excess over insurance "for which [Mega has] been added as an additional insured by attachment or endorsement," the Quincy policy is primary and the Harleysville policy is excess.  Reading the Quincy policy's "Other Insurance" provision does not change this conclusion because it provides that it is excess only over policies to which Mega has been added as an additional insured.  As noted above, Mega is the named, not additional insured, in the Harleysville policy.  Therefore, we conclude that the clauses are reconcilable; the Quincy policy is primary and the Harleysville policy is excess.

        **C. Mega's Claim That Quincy Acted in Bad Faith.**

        Mega argues that Quincy's handling of its claim constitutes bad faith as a matter of law. Specifically, Mega points to Quincy's failure to investigate or respond to inquiries regarding its claim, and its "unreasonable coverage positions."  (Pl.'s Mem., p. 35.)  Quincy, on the other hand, argues that Mega's bad faith claim should be dismissed and not presented to a fact finder.  While Quincy acknowledges that it could have been more responsive to Mega's claim, it argues that the evidence is insufficient to support a finding of bad faith.  We disagree with both Mega and Quincy.  A reasonable fact finder could find that Quincy acted in bad faith by ignoring multiple communications on Mega's behalf for more than two years, and then denying coverage based upon a position that is at odds with the laws of New Jersey and Pennsylvania, and contrary to the language of the policy. We are not, however, prepared to rule that Quincy's conduct constitutes bad faith as a matter of law,

and conclude that this issue is best left to the fact finder.

New Jersey does not have a bad faith statute, but does imply a duty to act in good faith in every contract, including those for insurance.  Pickett v. Lloyd's, 621 A.2d 445, 452 (N.J. 1993); Benevento v. Life USA Holding, Inc., 61 F. Supp. 2d 407, 424 (E.D. Pa. 1999).  An insurer is required to "exercise good faith in its dealings with the insured, particularly when the insured's money or other interests—for instance, reputation—may be at risk." American Home Assurance Co., Inc. v. Hermann's Warehouse Corp., 563 A.2d 444, 447 (N.J. 1989).

An insurer acts in bad faith where it denies coverage with knowledge or reckless disregard that there is no reasonable basis for doing so.  Pickett, 621 A.2d at 453.  Where the insurer's position with regard to coverage is incorrect but "fairly debatable," a claim for bad faith will not succeed.  Id. Accordingly, the New Jersey Supreme Court has stated that where an insured is not entitled to summary judgment on the merits of the claim, there can be no bad faith.  Id. at 454.  When coverage has been denied, "bad faith is established by showing that no debatable reasons existed for denial of benefits."  HGM Comm'ncs, Inc. v. Hartford Fire Ins. Co., 2007 WL 120235, at *6 (N.J. Super. Ct. App. Div. Jan. 19, 2007) (internal quotation marks omitted) (quoting Pickett, 621 A.2d at 457).

Delay by the insurer in the "investigation, evaluation and processing of the claim" may also demonstrate bad faith where no valid reasons existed for the delay and "the insurer either knew of, or recklessly disregarded, the fact that no valid reasons supported the delay." Enright v. Farm Family Cas. Ins. Co., 2005 WL 3588485 at *9 (D.N.J. Dec. 29, 2005).  Negligent delay in processing the claim, however, is insufficient to support a finding of bad faith.  Id. at *8.  Factors which may be relevant to whether delay is demonstrative of bad faith include the length and reason for the delay, the insurer's actual awareness of the insured's claim and the level of communication by the insurer

24

regarding their consideration of the claim. See Rodriguez v. N.J. Ins. Underwriter's Ass'n, 2009 WL

2778013 at *3 (N.J. Super App. Div. Sept. 3, 2009) (no bad faith for delay of eight months where

insurer diligently communicated with insured); Coleman v. Gulf Life Ins. Co., 514 So. 2d 944 (Ala.

1987) (no bad faith where delay was attributable to a computer malfunction.).

   Here, there is sufficient evidence from which a jury could conclude that Quincy acted in bad

faith.  Quincy's position that the policy applies only to claims where Mega was vicariously liable for

Dobek's negligence is unsupported by the policy's plain language or by Pennsylvania or New Jersey

law.  Further,  Dobek's operations were plainly the "but-for" cause of Tavares's injuries.   Quincy's

coverage position must also be viewed in conjunction with its repeated and unjustified failure to

respond to Mega's coverage claim.  Based upon these circumstances, which are discussed extensively

above, a reasonable fact finder could conclude that Quncy's coverage position was not debatable and

that it consciously delayed its coverage decision without any valid reason.  Accordingly, the parties'

cross-motions for summary judgment will be denied as they relate to Mega's bad faith claim.[10]

## IV. Conclusion

   For the reasons set out above, Plaintiffs' motion for summary judgment will be granted in part

and denied in part, consistent with this Opinion.  Defendant's motion for summary judgment will be

denied.  An appropriate order follows.

---

  [10]Quincy also argues that Mega's bad faith claim should be dismissed because there is no
evidence that Mega suffered damages since Harleysville defended Mega in the Tavares Action.
(Quincy Opp. Mem., pp. 32-32.)  Indeed, to recover on its bad faith claim, Mega must show
economic loss in addition to the policy benefits.  Pickett, 621 A.2d at 454.  However, Mega has
produced evidence of such a loss, including evidence indicating that its insurance premiums for
general liability insurance have increased as a result of Harleysville's defense. (Bodeker Dep., Pl.'s
Mem. Ex. V, p. 38.)  Further, punitive damages may be available if a jury concludes that Quincy's
conduct was "wantonly reckless or malicious."  Delli Santi v. CNA Ins. Co., 88 F.3d 192, 207 (3d
Cir. 1996).